UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
PADUCAH DIVISION
CASE NO. 5:10-CV-26

KENNETH SCRUGGS and BEVERLY SCRUGGS                PLAINTIFFS

and

WESTLAKE CHEMICAL CORP.                    INTERVENING PLAINTIFF

v.

SPERIAN FALL ARREST SYSTEM, INC.                         DEFENDANT

MEMORANDUM OPINION AND ORDER

This matter is before the Court upon the Defendant's Motion for Summary Judgment. DN 45. The Plaintiffs have responded. DN 51. The Intervening Plaintiff has also responded. DN 50. The Defendant has replied. DN 73. This matter is now ripe for adjudication. For the following reasons, Defendant's motion is DENIED.

BACKGROUND

The present case is properly before the Court based on its diversity jurisdiction and involves personal injuries and a products liability claim arising out of events at Westlake Chemical Corporation's ("Westlake") Calvert City, Kentucky facility. Westlake manufactures polyvinyl chloride ("PVC") resin at the Calvert City facility. After production, the PVC resin is loaded into railcars and shipped to other sites for use in industrial products.

The PVC resin is loaded into the railcars by Westlake employees known as PVC Operators. PVC Operators work on top of the railcars and use chutes suspended from overhead silos to load the resin into each car. There are walkways attached to the left- and right-hand sides of each railcar that extend down the car's 60-foot length. The PVC Operators use these

1

walkways to move atop the individual cars.  In addition to the walkways, each car has two smaller platforms on each end that run perpendicular to the length of the car.  These platforms protrude from the ends of the railcars and are used by the PVC Operators to traverse the gap between one railcar and the next.  Thus, while the walkways are used by PVC Operators to move atop one railcar, the perpendicular platforms are used by the employees to move between cars.  The PVC resin loading station is approximately 462 feet in length, and the perpendicular steps are an important time-saver in the loading process, allowing the PVC Operators to move between railcars without having to climb up and down each one.

While filling the railcars, the PVC Operators work some distance above the ground, subjecting them to potential injuries from falls.  In an attempt to prevent fall-related injuries, Westlake requires the PVC Operators to wear a "fall arrest system."  In general terms, fall arrest systems link an employee to an overhead, horizontal cable using harnesses, brackets, trolleys, and connectors to stop him or her from falling the full distance of a fall, if one occurs.  In other words, fall arrest systems do not prevent falls but instead are designed to catch an employee mid-fall in hopes of preventing injuries that might otherwise result.

One of the main components of fall arrest systems is a "self-retracting lanyard."  The lanyard contains an internal spool of cable with connectors on each end.  One connector attaches to a harness worn by the employee and the other connects to a trolley, which is secured to and slides along the overhead cable.  The cable in the lanyard is a predetermined length, and, in normal circumstances, freely extends or retracts with the employee's movements.  When subjected to a sudden pull or extension, however, (e.g., when an employee falls) brakes in the device engage and prevent the cable from being extended any farther, thereby stopping the fall.  The issues in the present case revolve almost entirely around the design and use of the Xenon

Overhead Horizontal Lifeline ("Xenon") manufactured by Sperian Protection Deutschland GmbH & Co. KG ("Soll") and sold to Westlake by the Defendant Sperian Fall Arrest Systems, Inc. ("Sperian").

Prior to January 2009, Westlake used a fall arrest system that was not designed or sold by Sperian. This "traditional" fall arrest system contained multiple segments and did not allow PVC Operators to freely move along the entire length of the rail line. Employees attached to the traditional system could only work over a limited length of railcars before being forced to unhook and reattach at another segment of the system. Sometime prior to August 2007, Westlake contacted Sperian about upgrading or replacing the traditional fall arrest system with a "continuous" system that would allow PVC Operators to move along the entire length of the rail line without having to connect and disconnect. PVC Operators would be able to move more freely with the continuous system because of a series of "intermediate brackets" that would bridge sections where employees had previously been forced to disconnect from the traditional system.

On August 15, 2007, Sperian sent Westlake a proposal for the Xenon system. On February 07, 2008, Westlake issued a purchase order to Sperian for the Xenon system. On August, 15, 2008, Sperian shipped the components of the Xenon to Westlake. After a delay for construction, the Xenon was finally installed at Westlake on January 12, 2009.

Not long after installing th Xenon, the events giving rise to this suit occurred. On the morning of February 16, 2009, Jeff Newnum, a PVC Operator at Westlake, was attached to the Xenon and was working on top of a railcar when he alleges that the fall arrest system malfunctioned, leading to an injury. According to Newnum, he was attempting to cross between railcars when he fell between the cars. Newnum Depo., DN 51-12, p. 3. Newnum alleges that

he felt the brakes on the self-retracting lanyard engage as he was passing between the cars, causing him to fall. *Id.* Newnum scrapped his right leg and injured his right shoulder in the fall, and Dustin Davis, Westlake's safety engineer, took him to the hospital. *Id.*; Newnum's Injury Incident Report, DN 45-26, p. 3.

Upon returning from the hospital, Davis, Newnum, and other members of Westlake's safety staff investigated Newnum's accident. Davis Depo., DN 45-6, pp. 5-13. During the investigation, Davis shutdown use of the Xenon system. *Id.* at 10. Davis then conducted a visual walk-through and inspected the cables, supports, trolley, self-retracting lanyard, shock-asbsober, and other components. *Id.* at 8. Upon inspection, Davis found that the Xenon "functioned." *Id.* Most significantly, Davis did not find that the Xenon had experienced a "load." *Id.* at 10.

The issue of "load" is addressed in the Xenon's "Operation and Maintenance Manual" that Sperian provided to Westlake. *See* DN 45-27. The manual specifies that workers must not use the system and should place a service call to Sperian if "there is a problem that renders the system out of order." *Id.* at p. 17. The manual gives an example of such a problem:

> An example of [a problem that renders the system out of order] is if the fall indicator button has popped or is missing this indicates that a load has occurred on the system either unintentionally or through a fall. If this occurs the system must not be used until it is inspected and or repaired by an authorized technician.

*Id.* While the manual does not indicate that this is the only error that can render the system inoperable, it is the only explicit example given. According to Sperian's instructions, the Xenon should not be used if the indicators on the system show that a "load" has occurred unintentionally or as the result of a fall. In his deposition Davis was asked about his inspection

4

of the Xenon's load indicators after Newnum's accident. Regarding the indicator on the self-retracting lanyard, Davis stated:

> **Q:** Did you make an inspection of the self-retracting lifeline?
>
> **Davis:** I looked and it had not -- just to see if it had experienced a load, and it had not -- the indicator did not show. And, you know, Jeff [Newnum] had told us that he didn't actually load the system, you know, as far as in a fall situation.

Davis Depo., DN 45-6, p. 10. Regarding the tension indicator on the shock-absorber, Davis stated:

> **Q:** [D]id you check to see if, after Mr. Newnum's fall, the tension indicator was signaling anything?
>
> **Davis:** Yes. I checked to see if it -- I actually checked to see if it actually showed that a fall had been on the system. I mean, that's part of the visual inspection I did, you know.
>
> **Q:** And what did the tension indicator indicate to you?
>
> **Davis:** That is had not been loaded.

Davis Depo., DN 45-7, pp. 18-19. Davis's inspection of the components of the Xenon did not show that the system had experienced a "load" that would render it out of order.

After completing their visual inspection of the Xenon system, Davis and other members of Westlake's Safety Department asked the Plaintiff, Kenneth Scruggs, to connect to the system and walk on top of the railcars. They did this despite the fact that Newnum had recently been injured, despite the fact that Newnum indicated that the Xenon played some role in his injury, and despite the fact that the safety team could not yet explain the source of Newnum's injuries. Both Scruggs and Westlake have admitted that Scruggs was instructed to "use the [Xenon] on February 16, 2009 for the purpose of recreating Jeff Newnum's accident." DN 45-14, p. 5; DN 45-17, p. 4. Again, according to Westlake and Scruggs's own admission, the purpose of having

5

Scruggs connect to the Xenon was to recreate Newnum's accident.

Once on top of the railcars, Scruggs walked in an area that was similar to the area where Newnum's accident occurred.[1] This part of the reenactment was uneventful. Davis Depo., DN 45-6, p. 12. Scruggs was then asked to proceed further down the railcars so that the safety team could continue to observe the Xenon for problems. *Id.* As Scruggs attempted to cross from one railcar to another, however, Davis observed the trolley hang on or in the vicinity of an intermediate support bracket. *Id.* at pp. 12-13. As Davis and other members of the safety staff watched, Scruggs fell partially between the two railcars. *Id.* at p. 12. Scruggs was injured in the fall and tore his right quadriceps tendon as a result of the impact he sustained when he struck a railcar. Patel Depo., DN 51-21, pp. 2-3. Two days later, while ascending the stairs in his home on crutches, Scruggs tore his left quadriceps tendon. Scruggs alleges that the left tendon tear was also caused by the accident at Westlake. *Id.* at p. 3.

As a result of the above described events, Plaintiff Scruggs has sued Sperian for selling a defectively designed product that caused his injuries, and he seeks to, among other things,[2] recover compensation from Sperian for his injuries. Plaintiff Westlake has intervened to recover the cost of Scruggs's medical treatment from Sperian. Defendant Sperian has moved for summary judgment, alleging that, even if the Xenon is a defectively designed (a point it contests), Westlake's actions were a superceding cause of Scruggs's injuries, and, as a result, Sperian is not liable for those injuries.

## STANDARD

---

[1] Although Scruggs walked in the same general area as the Newnum accident, he could not walk in the exact same location because the railcars had been moved after Newnum's accident. Davis Depo., DN 45-6, p. 12.
[2] Scruggs originally asserted an additional claim for punitive damages against Sperian. The Court will not address this claim here, however, because Scruggs has indicated that he will voluntarily dismiss the punitive damages claim. *See* DN 51, p. 4, n.2.

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). In determining whether summary judgment is appropriate, a court must resolve all ambiguities and draw all reasonable inferences against the moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

"[N]ot every issue of fact or conflicting inference presents a genuine issue of material fact." *Street v. J. C. Bradford & Co.*, 886 F.2d 1472, 1477 (6th Cir. 1989). The test is whether the party bearing the burden of proof has presented a jury question as to each element in the case. *Hartsel v. Keys*, 87 F.3d 795, 799 (6th Cir. 1996). The plaintiff must present more than a mere scintilla of evidence in support of his position; the plaintiff must present evidence on which the trier of fact could reasonably find for the plaintiff. *See id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)). Mere speculation will not suffice to defeat a motion for summary judgment; "the mere existence of a colorable factual dispute will not defeat a properly supported motion for summary judgment. A genuine dispute between the parties on an issue of material fact must exist to render summary judgment inappropriate." *Moinette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1177 (6th Cir. 1996).

Finally, while Kentucky law is applicable to this case pursuant to *Erie Railroad v. Tompkins*, 304 U.S. 64 (1938), a federal court in a diversity action applies the standards of Federal Rule of Civil Procedure 56, not "Kentucky's summary judgment standard as expressed in *Steelvest, Inc. v. Scansteel Serv. Ctr., Inc.*, 807 S.W.2d 476 (Ky. 1991)." *Gafford v. Gen. Elec. Co.*, 997 F.2d 150, 165 (6th Cir. 1993).

7

**DISCUSSION**

Sperian moves this Court for summary judgment arguing that Westlake's actions on February 16, 2009, were the superseding cause of Scruggs's injuries. Sperian contends that, as a matter of law, these actions were of such an extraordinary nature that they relieve Sperian of any liability it might otherwise face if the Xenon fall arrest system is found to be defective.

This Court, sitting in diversity, will apply substantive Kentucky law to the tort issues before it. *See Erie Railroad v. Tompkins*, 304 U.S. 64 (1938). Kentucky courts have adopted the rules laid out in the Restatement (Second) of Torts § 440-53 for determining when an intervening act becomes a superseding cause. *See House v. Kellerman*, 519 S.W.2d 380 (Ky. 1974). Under the Restatement, a "superseding cause is an act [i.e., intervening force] of a third person . . . which by its intervention prevents the [antecedent] actor from being liable for harm to another which his antecedent negligence is a substantial factor in bringing about." RESTATEMENT (SECOND) OF TORTS § 440 (1965). An intervening force is "one which operates in producing harm to another after the [antecedent] actor's negligent act or omission has been committed." *Id.* at § 441. An intervening force will become a superseding cause of injury where there are "facts of such 'extraordinary rather than normal,' or 'highly extraordinary,' nature, unforeseeable in character, as to relieve the original wrongdoer of liability to the ultimate victim." *Montgomery Elevator Co. v. McCullough*, 676 S.W.2d 776, 780 (Ky. 1984) (quoting *House*, 519 S.W.2d at 382). If a defendant asserts that another's act was a superseding cause of the plaintiff's injuries, and "there is no issue as to whether the act or event actually occurred, whether it constituted an independent cause superseding and eliminating the alleged negligence of the defendant as a legal cause should be determined by the court." *House*, 519 S.W.2d at 383. Only where there is a dispute over whether the alleged superseding act actually occurred should the superseding cause

analysis be determined by the finder of fact. *Id.* Absent a dispute over whether an alleged superseding act did in fact occur, the Court is tasked with determining whether that act is so "highly extraordinary" and "unforeseeable in character" as to relieve the defendant of liability.

Sperian asserts that "Westlake caused Scruggs's fall when it ordered Scruggs to recreate Newnum's inury. This grossly negligent (if not reckless) act thereby superseded any possible chain of causation between Sperian and Scruggs." DN 45-1, p. 16. Put another way, Sperian claims that "Scruggs was not injured while using the Xenon while performing his everyday job duties. Instead, he was injured because Westlake instructed him to recreate an accident that had already sent one of Scrugg's coworkers to the hospital." *Id.* at p. 19. Sperian argues that it cannot be held liable for Scruggs's injuries because, even if the Xenon was defective, Westlake was the real cause of Scruggs's injuries when Westlake asked him to connect to the Xenon, get onto the railcars, and recreate Newnum's accident. Discovery conducted in this case shows there is no dispute as to whether these events actually occurred. Sperian asked Westlake and Scruggs to admit the following:

> Admit that members of Westlake's [Safety Department] instructed [Kenneth Scruggs] to use the Xenon Horizontal Lifeline System on February 16, 2009 for the purpose of recreating Jeff Newnum's accident.

DN 45-14, p. 4; DN 45-17, p. 4. Both Westlake and Scruggs answered this request for admission in the affirmative. There is no dispute that Westlake had Scruggs use the Xenon after Newnum's accident for the purpose of recreating the accident.

Based on this admission, the real issue before the Court in this motion is a matter of law. Because it is undisputed that Westlake instructed Scruggs to use the Xenon in order to recreate Newnum's accident, the Court must decided whether these instructions constitute a superseding cause, relieving Sperian of liability. It is worth repeating that in Kentucky, an action will be a

9

superseding cause when it is of "such 'extraordinary rather than normal," or 'highly extraordinary,' nature, unforeseeable in character, as to relieve the original wrongdoer of liability to the ultimate victim." *Montgomery Elevator Co.*, 676 S.W.2d at 780 (quoting *House* 519 S.W.2d at 382).

In *KNC Hosp., Inc. v. Anthony*, 849 S.W.2d 564, 568 (Ky. App. 1993), the Kentucky Court of Appeals attempted to further define "superseding cause." According to the court, superseding causes possess the following six attributes:

> 1) an act or event that intervenes between the original act and the injury;
>
> 2) the intervening act or event must be of independent origin, unassociated with the original act;
>
> 3) the intervening act or event must, itself, be capable of bringing about the injury;
>
> 4) the intervening act or event must not have been reasonably foreseeable by the original actor;
>
> 5) the intervening act or event involves the unforeseen negligence of a third party [one other than the first party original actor or the second party plaintiff] or the intervention of a natural force;
>
> 6) the original act must, in itself, be a substantial factor in causing the injury, not a remote cause. The original act must not merely create negligent condition or occasion; the distinction between a legal cause and a mere condition being foreseeabiltiy of injury.

*Id.* Applying the *Anthony* attributes to the present case shows that Westlake's actions, although intervening, do not rise to the level of a superseding cause.

The third *Anthony* attribute of a superseding cause requires that the intervening act must, itself, be capable of bringing about the injury. *Id.* Assuming that the Xenon was a substantial factor in causing Scruggs's injuries (*Anthony* attributed six), it is clear that Westlake's actions, of their own accord, would not have been capable of brining about Scruggs's injuries. Sperian

10

claims that Westlake's instructions to recreate Newnum's accident are the superseding cause of Scruggs's injuries. But the instructions alone would not have been sufficient to cause the harm experienced. Sperian has not shown how Westlake's intervening act would have brought about Scruggs's injuries absent, or even in the face of, a problem with the Xenon falls arrest system. The Court does not dispute that there was little wisdom in placing Scruggs on top of the railcars for the admitted purpose of recreating Newnum's accident, but an absence of wisdom is not an *Anthony* attribute of superseding causes; injury resulting independently from the intervening cause is required, and Sperian has not shown that Westlake's actions alone would have caused Scruggs's injuries.

Furthermore, under the fourth *Anthony* attribute, the Court finds that Westlake's instructions to Scruggs were reasonably foreseeable given the fact that none of the indicators on the Xenon system showed that it had been put under a "load" or was otherwise inoperable. According to Sperian's own instructions the Xenon system should not be used if any of the system's components indicate that a load has occurred. Dustin Davis, Westlake's safety engineer, inspected the Xenon for indications of a load after Newnum's accident. Davis Depo., DN 45-6, p. 10; Davis Depo., DN 45-7, pp. 18-19. Finding no indication that the Xenon should not be used, it was foreseeable that Davis would find the system operational. Where the Xenon system gave no indications that it was inoperable, it was foreseeable that Westlake would instruct its employees to use the system. A different result would occur if, after Newnum's accident, the Xenon indicated a load and Westlake disregarded the indicators when instructing Scruggs to use the system anyway. This is not what happened, however, and it was foreseeable that Westlake would use the system, even after Newnum's accident, where the Xenon's own components said that the system was operational. The Court sees no further need to analyze the remaining

*Anthony* attributes where these two attributes clearly demonstrate that Westlake's actions, as asserted by Sperian, were not a superseding cause of Scruggs's injuries.

A review of Kentucky case law on superseding cause in products liability and negligence actions demonstrates that Westlake's intervening act does not rise to the level of superseding cause. *Montgomery Elevator* involved a design-defect products liability claim against the manufacturer of an escalator installed in a Kentucky shopping mall. *Montgomery Elevator Co.*, 676 S.W.2d at 778. The suit was brought by the parents of a ten-year-old boy who lost part of his right foot when his shoe caught in the escalator. *Id.* The manufacturer appealed an unfavorable jury verdict, arguing that omissions by escalator's owner, a department store, were a superseding cause of the boy's injuries. *Id.* The manufacturer warned the department store, after the escalator has been installed, of potential accidents like the one the boy suffered. *Id.* The manufacturer also suggested several remedies that would reduce the likelihood of an accident and offered to sell the store parts that would accomplish the necessary modifications. *Id.* The store did not buy the parts and took no remedial actions. *Id.* Holding that the department store's acts or omissions were not a superseding cause of the boy's injuries, the Kentucky Supreme Court said:

> The manufacturer has a non-delegable duty to provide a product reasonably safe for its *foreseeable* uses, a duty not abrogated by warning to the immediate purchaser. The purchaser who has notice of the dangerous condition may be concurrently liable to the ultimate user for failure to provide adequate warning, for failure to remedy the defect or some other basis, but the purchaser's failure to act is not a [superseding] cause except in extraordinary circumstances.

*Id.* at 782 (emphasis added). The department store's failure to heed the manufacturer's warnings was not a superseding cause because the boy's use of the escalator and resultant injuries were foreseeable to the manufacturer. *Id.* According to *Montgomery Elevator*, the manufacturer of a defective product is liable for injuries caused by that product, so long as those injuries are

12

foreseeable to the manufacturer, even where the manufacture has subsequently warned the purchaser that such injuries could occur.

In an earlier case, *Strum, Ruger & Co. v. Bloyd*, 586 S.W.2d 19 (Ky. 1979), the Kentucky Supreme Court found that disregard of a manufacturer's warnings could be a superseding cause. In *Strum*, the plaintiff was injured when a gun concealed beneath the floor mat of Gordon Prince's car fell out on the ground and accidentally discharged. *Id.* at 22. The safety device on the particular gun model was known to be unreliable, and, at the time of purchase, the manufacturer provided Prince with extensive warnings and literature on how to safely store and carry the weapon. *Id.* at 20-21. Prince disregarded the warnings and kept it in an unsafe manner. *Id.* at 21-22.

> Was Ruger required to anticipate that the revolver would be carried under the floor mat of an automobile with all six chambers loaded and the hammer resting on live ammunition? We think not. It is required of Ruger to anticipate *reasonable* use; that use being in keeping with the written warning.
> . . . Regardless of the design or manufacturing of the revolver, the use to which it was put was the agency that brought about the injury complained of. The manufacturer had no control over the gun. It was under the sole and exclusive control of Prince, and his conduct in the handling of the revolver, as illustrated by the proof, was the substantial factor which caused the injury.

*Id.* at 22 (emphasis added). According to *Strum*, the mishandling and improper storage of the gun in contradiction of the manufacturer's warnings was of such a highly extraordinary and unforeseeable nature that it became a superseding cause and alleviated the manufacturer of liability.

*Montgomery Elevator* and *Strum* both involve purchasers using products in contravention of the manufacturers' warnings, but in *Montgomery Elevator* such actions are not a superseding cause and in *Strum* they are. What explains the difference in outcomes? The most important difference is that the plaintiff's injuries in *Montgomery Elevator* were foreseeable to the

13

manufacturer as shown by the fact that the manufacturer's warnings were issued after the department store purchased the elevator. In *Strum*, on the other hand, the manufacturer could not have foreseen that the purchaser would load the firearm in an incorrect and dangerous manner that was contrary to its previously provided warnings and conceal the gun beneath the floor mat of his car where it would eventually cause an injury. The acts of the gun owner in *Strum* were of such an extraordinary nature that the court found them to be a superseding cause of the plaintiff's injuries.

The Court finds the present case to be more like *Montgomery Elevator* than *Strum*. In *Montgomery Elevator*, the department store *knew* of potential escalator-related injuries because it has been warned by the manufacturer. Despite this fact, the store's omissions were not a superseding cause because the eventual injuries were foreseeable to the manufacturer. In the present case, Westlake had *no* knowledge of any defect with the Xenon that would render it inoperable. As such, it was foreseeable to Sperian that Westlake would use the Xenon where the device's own indicators did not show that it was inoperable. Intervening acts never rise to the level of superseding causes where they are foreseeable. Use of the Xenon in these circumstances was not so extraordinary and unforeseeable as to relieve Sperian of all liability.

Kentucky courts have also addressed the issue of foreseeability and superseding causes outside of the products liability context. In *Waldon v. Hous. Auth. of Paducah*, 854 S.W.2d 777, 779 (Ky. App. 1991), the court found that "an intervening criminal act does not relieve one for liability for his or her negligent acts or omissions, where the criminal act is a reasonably *foreseeable* consequence of the defendant's negligent act." (emphasis added). In *Waldon*, Magdalene Smith was shot and killed outside of a housing project where she lived in Paducah. *Id.* at 778. The evidence showed that the housing authority was informed by multiple sources

that Smith's killer, Williams, had made repeated threats against Smith's life and that Williams was living in the complex without permission. *Id.* at 779. Although a landlord cannot guarantee a tenant's safety, "a landlord's conduct can make him liable to his tenant for criminal acts of third persons, if the landlord fails to take reasonable steps to avoid injury from reasonably *foreseeable* criminal acts." *Id.* (emphasis added) (citations omitted). *Waldon* exemplifies the rule that even intentional criminal acts are not superseding causes where they are foreseeable to a defendant. *Cf. Briscoe v. Amazing Products, Inc.*, 23 S.W.3d 228 (Ky. App. 2000) (*unforeseeable* intentional criminal acts are a superseding cause in Kentucky law).

In *Greyhound Corp. v. White*, 323 S.W.2d 578 (Ky. 1958), a Greyhound bus with a flat tire pulled over on the right-hand side of a two-lane road for repairs. Although the bus pulled off the road as much as possible, a portion of it still remained on the pavement. *Id.* at 580. While the Greyhound driver was repairing the tire, a school bus, going in the same direction as the Greyhound, pulled into the left-hand lane to pick up children between 34 and 80 feet to the rear of the Greyhound. *Id.* At this point, some portion of both lanes was blocked by the buses. Shortly after the school bus stopped, the plaintiff's car drove up behind the school bus, struck it on the right rear, crossed the road, and struck the Greyhound on the left rear, causing injuries to the car's passengers. *Id.* At trial, the jury found Greyhound negligent and partially responsible for the plaintiffs' injuries. On appeal, the verdict was overturned and the court found:

> [T]he act of the school bus driver in stopping on the left side of the road in such a position as to materially obstruct, if not completely block, the highway, was so unusual and extraordinary as not to have been reasonably *foreseeable* by the Greyhound driver, and therefore it constituted a superseding cause relieving the Greyhound driver of liability.

*Id.* at 581-2 (emphasis added). The court stated the rule of superseding cause as follows:

15

> If the original negligent act set in force a chain of events which the original negligent actor might have reasonably *foreseen* would, according to the experience of mankind, lead to the event which happened, the original actor is not relieved of liability by the intervening act. If, however, the ultimate injury is brought about by an intervening act or force so unusual as not to have been reasonably *foreseeable*, the intervening act is considered as the superseding cause and the original actor is not liable.

*Id.* at 581 (emphasis added) (citing *Hines v. Westerfield*, 254 S.W.2d 728, 729 (Ky. 1953)).

*Waldon* and *Greyhound* consider the issue of superseding cause and arrive at different outcomes. Once again, however, the differing results turns on the issue of foreseeability. The intervening act by the school bus in *Greyhound* - stopping in the wrong lane - was so attenuated, unusual, and unrelated to any act by the Greyhound driver that the court found it to be a superseding cause. On the other hand, even the intentional criminal conduct at issue in *Waldon* was not a superseding cause because it was foreseeable to the housing authority. The present case is more like *Waldon* than *Greyhound*. Westlake's actions were foreseeable to Sperian where the Xenon gave no indication that it was inoperable.

A common theme runs throughout the superseding cause cases examined above. Whether the cause of action sounds in products liability (*Montgomery Elevator* and *Strum*) or in negligence (*Waldon* and *Greyhound*), all of the cases turn on the issue of foreseeability. If the intervening action was foreseeable to the original actor, then courts have been reluctant to find a superseding cause. If, on the other hand, the intervening action was unforeseeable, then a superseding cause will relieve the original actor of liability. Again, the Court finds that under the fourth *Anthony* attribute of superseding causes, Westlake's actions were foreseeable to Sperian because the Xenon system did not indicate that a load had rendered it inoperable.

In addition to the *Anthony* superseding cause analysis, the Court finds that Westlake's actions were not a superseding cause of Scruggs's injuries because any injuries caused by

16

Westlake's intervening act were within the scope of the risk of the created by the Xenon system.

The Second Restatement of Torts is instructive on this point:

> Where the negligent conduct of the [antecedent] actor creates or increases the risk of a particular harm and is a substantial factor in causing that harm, the fact that the harm is brought about through the intervention of another force *does not* relieve the [antecedent] actor of liability, except where the harm is intentionally caused by a third person and is not within the scope of the risk created by the [antecedent] actor's conduct [i.e., not foreseeable].

RESTATEMENT (SECOND) OF TORTS § 442B (1965) (emphasis added). "[A]ny harm which is in itself foreseeable, as to which the actor has created . . . is always 'proximate,' no matter how it is brought about, except where there is such intentionally tortious or criminal intervention, and it is not within the scope of the risk created by the original negligent conduct." *Id.* at cmt. b. Section 442B speaks in terms of causation as it relates to negligence but is also applicable to a products liability case. *See* RESTATEMENT (THIRD) OF TORTS: PRODUCTS LIABILITY § 15 (1998) ("Whether a product defect caused harm to persons . . . is determined by the prevailing rules and principles governing causation in tort."). The Court has not, and cannot, make any determination as to whether the Xenon system was a defective product, but injuries caused by falls are the types of injuries one would expect to be associated with the system (e.g., within the scope of the risk). As § 442B points out, where the harm brought about by an intervening force is a harm coming within the same scope of the risk created by the original actor, the intervening force cannot be a superseding cause of injury.

Illustration five accompanying § 442B helps clarify this point. According to illustration five, "*A* negligently leaves an excavation in a public sidewalk, creating the risk that a traveler on the sidewalk will fall into it. *B*, passing *C* on the sidewalk, negligently bumps into him, and knocks him into the excavation. *A* is subject to liability to *C*." *Id.* at illus. 5. In this scenario, *C*

17

suffers injuries that are within the scope of the risk created by *A*'s action, regardless of the fact that *B*'s intervening force knocked *C* into the excavation. Though *B* will bear some portion of the fault, the ultimate injury suffered by *C* is foreseeable to *A*, and *B*'s actions are not a superseding cause.

In the present case, Scruggs, while using the Xenon, sustained fall-related injuries. Because Scruggs's injuries were within the scope of the risk associated with using the Xenon system, Westlake's intervening acts, which may have contributed to the fall, were not a superseding cause of Scruggs's injuries.

## CONCLUSION

Since Westlake's actions do not fit the third and fourth *Anthony* attributes, and because Scruggs's injuries were within the scope of the risk created by Sperian, Westlake's actions are not a superseding cause of Scruggs's injuries. For the foregoing reasons Defendant Sperian's Motion for Summary Judgment is DENIED.